## MEADOWS v. THE STATE.

No. 12428. SEPTEMBER 15, 1938.

*J. A. Beazley,* for plaintiff in error.

*M. J. Yeomans,* attorney-general, *C. S. Baldwin Jr.,* solicitor-general, *Ellis G. Arnall,* and *E. J. Clower,* contra.

GRICE, Justice. Clyde Meadows was convicted of the offense of murder, with a recommendation. The indictment charged that he "with force and arms and with malice aforethought, wantonly and with reckless disregard for human life, drove an automobile on and over the public road running through the City of Union Point, Ga., known as State Route No. 12, while under the influ-

ence of intoxicating liquors and drugs, and at a rate of speed greater than ,allowed by law, and while so operating said automobile over said road did approach and overtake one Theldred Chapman, a human being in the peace of the State, who was walking down said road, said accused not then and there having said automobile under immediate control as provided by law, so that as a result of said unlawful, wanton, and reckless operation of said automobile by accused said automobile was driven on, over, and into said Theldred Chapman, thereby killing and murdering said Theldred Chapman," etc. He made a motion for new trial on the general grounds only, which was overruled, and he excepted.

■ The uncontradicted evidence shows that Chapman, a pedestrian on a public highway within the limits of the City of Union Point, Georgia, was run over and killed by the accused while driving an automobile at a higher rate of speed than that permitted by an ordinance of the city. Were the facts such as to justify the jury in finding the defendant guilty of murder? His counsel takes the position that the killing was an accident, which the accused did his best to prevent, but could not. So far as it appears from the record, the accused and the deceased were strangers to each other. There is no suggestion of ill will and no proof of express malice. Witnesses testified to the good character of the prisoner, and no evidence was offered as to his general bad character. The killing occurred at about six-thirty o'clock on a Saturday evening, near the center of the corporate limits of a municipality, on a public road, unpaved, but sixty feet wide, with no ditch on either side. The automobile that ran over the deceased was, at the time being driven about forty miles an hour on a highway frequently traveled. By an ordinance of Union Point it was unlawful to drive an automobile on any street, road, or highway therein at a speed greater than twenty-five miles per hour. The accused did not stop after his car hit the deceased, but, though told by Roger Harden, who was traveling with him, that he had hit and killed a man, the accused continued on his way. Harden testified: "I told him three times before he ever hit the man that yonder was a man walking. . . I don't have an idea he saw him as quick as I did, because he was on my side." There was evidence to show that the accused was driving on the extreme right of the road, and that the deceased was walking on the same side of the road. Several witnesses tes-

tified to seeing him driving his car that afternoon in a manner they regarded as reckless. Other testimony was sufficient to justify the inference that earlier in the afternoon he was under the influence of liquor. When arrested at about midnight, "he appeared to be groggy, like he was drinking. He appeared to me as if he was just getting over a drunk. That is the way it looked to me, smelled it. I looked at his eyes and face, looked at him good, I am sure I smelled whisky on him." So testified one of the arresting officers. Cecil Cary swore he was drunk that afternoon.

We think the facts and circumstances of the killing, as disclosed by the testimony of the State's witnesses, sufficient to authorize the jury to find the defendant guilty of murder. See *Butler* v. *State,* 178 *Ga.* 700 (173 S. E. 856); *Jones* v. *State,* 185 *Ga.* 68 (194 S. E. 216). There was only one actual eye-witness to the killing, Roger Harden, who was sworn by the defendant. It is earnestly insisted by his counsel, that, regardless of what other witnesses swore as to his conduct immediately before and after, the evidence of this witness shows that the death of the deceased resulted from his own conduct in suddenly stepping in front of the automobile, and therefore that the homicide was directly due to an independent and intervening cause for which the accused was not responsible. His position is that there can be no conviction, even of involuntary manslaughter in the commission of an unlawful act by a drunken speeding driver, when the conduct of the pedestrian would have brought about his own death on that occasion, even if the driver of the car had not been drunk and had not been driving at a greater rate of speed than that allowed by law. The portions of the testimony of Roger Harden in point are: "I was in the car with Clyde [Meadows] when this accident happened. . . The accident happened not so very far before you turn off the highway to go to the stores. . . I was on the front seat with him. . . When I first saw the man [the deceased] he was walking by the side of the road, the right-hand side. He got outside the road. . . He walked on the outside of the road, and then he started back into the road, and just as he started back into the road I could see him guide his head to the left-hand side and looked back and saw us, and when he started back into the road Clyde was right on him. He cut to the right-hand side of the road to go around him, and just as he cut to the right the man

turned his head this way and recognized the car behind him, and the man started back out of the road, and Clyde started back in the road, and at that time he hit him. As far as I could know, it looked to me like Clyde did everything he could to miss him. The man was on the right-hand side of the road. He then started like a person would ordinarily come back in the road, not to say going across the road. Clyde turned to the right to miss him. The man then kind of cut his eyes and started stepping back, started back out of the road. Then Clyde cut back to the left. As to whether the car made a pretty good swerve, he was just cutting this way. . . With reference to whether the man stepped in the road, he went back in the road. Clyde tried to turn to the right to avoid him. The man glanced around and saw him. Clyde cut back to the center of the road when the man started out of the road. The bumper of Clyde's car hit the man, as well as I could judge, hit there along about that light, the right side of the bumper, on the edge of the lights. . . The man was walking like this [indicating], with his back to us. He walked down the road, the truck went by, and he kind of weaved over and looked back, and he stepped back out of the road like this. He was not walking fast—a common gait. He was walking along, and the truck went by him. I don't know how far he stepped back when the truck went by. He just walked a little further over in the road. He was still over on the right-hand side of the highway; we all were on the right-hand side. . . He walked out a little bit when the truck passed, and he saw this other car, and he stepped back a little. I told him I reckon two or three times, I said 'There a man, there a man, there a man.' It scared me. I saw him, and he went to cutting then. I told him three times before he ever hit the man that yonder was a man walking. . . I don't have an idea he saw him as quick as I did, because he was on my side. . . I first hollered when he stepped further into the road and got in our way. Clyde then turned to the right. The man looked back and could discern the car behind him, and started back out of the road. Clyde undertook then to cut to the left to keep from hitting him, and that is when he hit him."

If this testimony stood uncontradicted, the argument predicated upon it would present a very serious question. But the jury could have found that the facts were materially different from what the

witness represented them to be. Instead of driving the car in the usual manner immediately before the injury was inflicted, the witness Tuggle testified that the car "wabbled." Instead of swerving the car suddenly in the effort to prevent striking the pedestrian, who, it is claimed, had unexpectedly changed his course and placed himself directly in front of the car, the testimony of the witness Tuggle was as follows: "I would say from where I first saw Clyde [Meadows] to where the boy was killed at was around 150 yards; from where I met him it must have been around 100 yards. Somewhere between that 100 yards and the scene of the accident I met this other car, but of course that car had already been met and gone. I had passed the scene of the accident when I met the first car; then I met Clyde. That was something like 100 yards from where the accident happened. I turned around and looked and watched Clyde's car. The car kind of wabbled down there. It looked like, as I stated awhile ago, that it was about to turn over. I thought it was a pretty violent wabble, a pretty wide one. I thought he had just lost control of it. I thought from that that the party might have been drunk, not that I had seen him drink any or had seen him at all. It did not appear to swerve one way and may be another and back, but just made an unusual movement down there. It was between me and another street light down there. I couldn't see it good, but it appeared that it liked to have turned over or something, you know. I imagine that was when the young man was struck that was killed. In other words, about the place where I saw the car wabble was where I found the man that was hit."

To say that an automobile wabbled gives a very different impression as to its performance from that testified to by the defense witness. It indicates involuntary action on the part of the driver. Among the definitions of the word "wabble" in the New Standard Dictionary are: "to vacillate or sway unsteadily from side to side; to vacillate or show unsteadiness." The New Merriman-Webster defines it as follows: "To move or move along with an irregular rocking or staggering motion or unsteadily from one side to the other." Who can forget the description of the "double wabble" given by Judge Longstreet in his sketch of the shooting match, in his "Georgia Scenes?" Again, instead of believing the testimony of the defense witness that the defendant was unable until near

him to see the pedestrian, on account of another vehicle, a witness for the State testified in substance that his attention was called to the unusual manner in which the defendant was driving, stopped his own car, and was at the very moment looking up the road in the direction of the defendant's car, and that there was no other car to obstruct the driver's view. There was also testimony from another source to contradict the defense witness. Instead of swerving his car suddenly in the effort to prevent striking the pedestrian, who, unexpectedly to the driver, had suddenly moved and placed himself in front of the car, the witness Wyatt testified: "Mr. Tuggle pointed out the tracks of the car that he met and the car that hit this Chapman boy, and we followed the tracks from up the road, near 100 yards, come right on down the right-hand side of the road about where the ditch ought to be, and right down here where this car swerved to the left the glass had fallen, the headlight, . . and then on down the road about 15 or 20 feet from where this glass began to fall was a pool of blood, and the blood was more out in the road or highway there than this right-hand track and glass. That looks like it had carried the man out towards the center of the road from where he was hit. The car that hit him did not make any turn until after the glass was lying in the road. It came on down. Mr. Tuggle pointed the track out where he met it, we following the track on down, and there was no turn to go to the left until where the glass started to fall, and then it goes back to the left. . . He must have turned up after he hit him. The track showed he cut back to the left, towards the center of the road."

■ Drunkenness, like any other fact, may be proved by indirect as well as direct testimony. When a witness testifies to the actions and appearance of the accused, and forms an opinion therefrom that he was drunk, and so testifies, his evidence is material and has probative value. When the issue is whether or not at a certain hour the accused was under the influence of intoxicating liquors, testimony as to his conduct, actions, and appearance a few hours before and a few hours afterward is relevant on that question. The fatal injury occurred about 6:30 p. m. The accused was arrested near midnight thereafter. A State's witness testified: "I helped arrest him. He was in a drunken stupor at the time we arrested him. I say that because he acted like it and he talked like it and he walked

like it, and I smelled liquor on him. I could smell it plainly." The two other arresting officers testified virtually to same effect, as to the prisoner's condition when they arrested him. The evidence authorized the conclusion that the accused was under the influence of intoxicating liquors at the time.

■ Upon a careful review we are unable to say that the verdict is unsupported by the evidence. The charge to the jury is not before us, but we are bound to assume that the various theories presented by the testimony were fairly and fully presented; that the jury duly considered, under proper instructions, whether the homicide was an unavoidable accident, or whether under all the facts and circumstances the offense was involuntary manslaughter instead of murder. It is our duty to give effect to the finding of the jury, when it is supported by the evidence, that even if the killing were involuntary, it is nevertheless murder "if such involuntary killing shall happen in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being," for our law declares that in such a case "the offense shall be deemed and adjudged to be murder." Code, § 26-1009. We are bound to conclude that in overruling the motion for new trial the judge exercised the sound discretion which the law wisely placed in his hands, and that his refusal meant that he approved of the verdict. It is the duty of the judge, on motion, to grant a new trial, though there be some evidence to support the verdict, if he feels that it is against the weight of the evidence, or that on the whole justice would be better served if a new trial were granted. But we have no such power. Although we might have been better satisfied if the jury had found the defendant guilty of involuntary manslaughter instead of murder, or if the judge had granted a new trial, "yet as a jury of the vicinage has seen proper to render a verdict for the defendant in error in a case turning upon questions of fact, the judge who presided in the case has approved the verdict, and the motion for a new trial is confined to the general grounds, this court, in accordance with the rule of non-interference in such cases, feels constrained to affirm the judgment overruling the motion for a new trial." *Walters* v. *Freeman*, 116 *Ga.* 423 (42 S. E. 741).

*Judgment affirmed. All the Justices concur, except Atkinson, P. J., who dissents.*